ALLEGHENY COUNTY INSTITUTION DISTRICT and John J. Kane Regional Centers, Petitioners,

v.

DEPARTMENT OF PUBLIC WELFARE, Respondent.

Commonwealth Court of Pennsylvania.

Argued June 5, 1995.
Decided Dec. 5, 1995.

Dennis R. Biondo, Assistant County Solicitor, for petitioners.

Jason W. Manne, Assistant Counsel, for respondent.

Before DOYLE and FRIEDMAN, JJ., and NARICK, Senior Judge.

DOYLE, Judge.

The Allegheny County Institution District (Allegheny County) appeals from a final order issued by the Secretary of the Department of Public Welfare (DPW) which denied it reimbursement for medical costs incurred in the operation of its long-term care nursing facilities which were in excess of DPW's net operating cost ceilings, and also denied it reimbursement for costs of depreciation and interest which were in excess of DPW's $22,-000 per bed limit.

## I. Factual Background

Allegheny County is the owner and operator of four long-term care nursing facilities, known as the John J. Kane Regional Centers,[1] which provide medical services to the poor pursuant to DPW's Medical Assistance Program.[2] These facilities were built during 1982 and 1983 to correct health and safety deficiencies which existed at the John J. Kane Hospital, a pre-existing facility owned by Allegheny County. Prior to their construction, and pursuant to Section 1122 of the Social Security Act (SSA),[3] the plan for the proposed facilities was submitted for review to the Pennsylvania Department of Health and to the federal Department of Health and Human Services. Final approval of the project, at a cost of $71,737,000.00, was obtained from the State Department of Health on April 25, 1982. Allegheny County recognized at that time that its construction costs would exceed the $22,000 per bed reimbursement limit for depreciation and interest, but was hopeful that this limit would be raised by DPW to account for inflation.[4]

Pennsylvania's Auditor General, pursuant to her authority under Section 443.1(2) of the Public Welfare Code (Code),[5] issued audit

---

1. The four centers are the Ross, Scott, McKeesport and Glen–Hazel Regional Centers. Each center is a 360 bed facility providing both skilled and intermediate nursing care.

2. Public Welfare Code, Act of June 13, 1967, P.L. 31, as amended, 62 P.S. §§ 401–493; Medical Assistance Manual, 55 Pa.Code §§ 1101.11–1251.81. The Medical Assistance Program is administered in conformity with Title XIX of the Social Security Act, 42 U.S.C. §§ 1396–1396q.

3. 42 U.S.C. § 1320a–1.

4. Herbert Higginbotham, an expert on the subject of construction costs, testified that if the $22,000 per bed limitation, which was implemented on October 14, 1978, 8 Pa.Bull. 2828 (1978), was adjusted for inflation, it would have to be raised to $33,470.

In its financial feasibility study submitted to DER in 1979, and upon which approval for the project was obtained, Allegheny County acknowledged that if the limits for depreciation were not changed or if its operating costs exceeded DPW's net operating cost ceilings, any deficiencies would have to be funded through the taxing power of Allegheny County.

5. 62 P.S. § 443.1(2).

reports for the four new regional centers for the years 1983, 1984 and 1985, to determine what costs Allegheny County would be reimbursed under the Medical Assistance Program. In these reports, the Auditor General disallowed those operating costs which exceeded the net operating cost limit [6] as well as the costs for depreciation and interest which exceeded the $22,000 per bed limit. Altogether, $33,552,174 in reimbursements for operating costs and depreciation were disallowed by the Auditor General.[7]

Allegheny County appealed the Auditor General's reports for the years 1983 through 1985.[8] Hearings were held before an attorney examiner for DPW's Office of Hearings and Appeals on June 26, 1990 and January 24, 1992. By stipulation of the parties, all but two issues in this case were resolved; the two outstanding issues as framed by that agreement were:

(a) Whether the Commonwealth is liable to reimburse [Allegheny County] for 90% of the non-federal share of the costs incurred by the [Allegheny County Institution District] for the operation of the Kane Regional Centers prior to the application of the Department's ceilings on net-operating costs?

(b) Whether [DPW's] regulatory limit of $22,000/bed on reimbursement for depreciation and interest on capital indebtedness is valid and enforceable against the Kane Regional Centers?

(Stipulation of Settlement at 2; R.R. at 454a.) The attorney examiner upheld the denial of reimbursement costs which exceeded DPW's ceiling for net operating costs, but found that the $22,000 per bed limitation for depreciation and interest was invalid and unenforceable against Allegheny County. By an order dated May 20, 1993, the Director of

the Office of Hearings and Appeals adopted the attorney examiner's decision in its entirety.

DPW then requested reconsideration of this decision by the Secretary of DPW. The Secretary granted the request, and subsequently, by a final order dated November 22, 1994, the Secretary affirmed that part of the decision which had denied Allegheny County reimbursement for operating costs which exceeded the net operating cost ceilings, but reversed that part of the decision which had held that the $22,000 per bed limitation for depreciation and interest was invalid. Allegheny County now appeals the Secretary of DPW's decision to this Court.

On appeal, Allegheny County raises the same two issues argued below: (1) whether DPW was required to reimburse Allegheny County for operating costs expended under the Medical Assistance Program which exceeded DPW's net operating cost ceilings; and (2) whether DPW was required to reimburse Allegheny County for costs of depreciation and interest which exceeded DPW's limit of $22,000 per bed. For the reasons explained below, we affirm.

## II. Net Operating Cost Ceilings

■ Initially, it is important to recognize that Allegheny County does not argue that DPW has misapplied valid regulations or that DPW has in some way simply miscalculated the amount of money which Allegheny County is entitled to under those regulations. Allegheny County concedes that if DPW's regulations are in fact valid, then it is not entitled to reimbursement for any of the costs which were denied by DPW. Instead, Allegheny County argues that DPW's net operating cost ceilings, adopted under DPW's regulatory authority,[9] are in direct conflict with

6. The net operating cost ceilings for these three years ranged from $64.06 to $72.49 (per day/per patient) for skilled care and $48.02 to $58.81 (per day/per patient) for intermediate care. (Auditor General Reports at 3, 3 (1/6/89), Reproduced Record (R.R.) at 41a, 180a.)

7. $12,576,210 of the disallowed costs was for depreciation and interest in excess of the $22,000 per bed limitation; $20,975,964 of the disallowed costs was for operating costs in excess of the net operating cost ceilings.

8. Allegheny County appealed the audit reports for the Scott and Ross Centers for 1983, and appealed the audit reports for all four facilities for 1984 and 1985.

9. DPW's net operating cost ceilings are currently found in Section 1181.66 of Title 55 of the Pennsylvania Code. DPW originally codified this section on July 24, 1981, and it became effective July 25, 1981. 11 Pa.B. 2610 (1981). The net operating cost ceilings have been amended repeatedly since that time. For the years at issue

Section 472 of the Code, 62 P.S. § 472, and therefore, are invalid regulations which cannot justify DPW's refusal to reimburse Allegheny County for medical costs incurred in the operation of its long-term nursing care facilities.

Section 472 of the Code authorizes the Department:

> To compute for each month the amount expended as **medical assistance** for public nursing home care on behalf of persons at each public medical institution operated by a county, county institution district or municipality. . . . From such total amount the department shall deduct the amount of Federal funds properly received or to be received by the department on account of such expenditures, and shall certify the remainder . . . to each appropriate county, county institution district or municipality. The amounts so certified shall become obligations of such counties, county institution districts or municipalities to be paid to the department for assistance . . . And provided further, That for fiscal year 1979–80 and thereafter, **the obligations of the counties shall be . . . one-tenth of the amount so certified above for public nursing home care.**

62 P.S. § 472 (emphasis added). The above-quoted section clearly authorizes the reimbursement by DPW of ninety percent of Allegheny County's operating costs, excluding federally reimbursed funds, which are expended on "medical assistance." Allegheny County argues that under this section, it is entitled to reimbursement for ninety percent of **all** reasonable costs incurred in providing medical care for eligible patients under the Medical Assistance Program, not just their "medical assistance" costs.

In order to fully understand the issue presented, and the extent to which Allegheny

County is entitled to reimbursement, it is necessary to first determine what costs are reimbursable as "medical assistance payments" as that term is used in the Code. Section 443.1 of the Code states:

> The following **medical assistance payments** shall be made in behalf of eligible persons whose institutional care is prescribed by physicians:
>
> . . . .
>
> (2) The cost of skilled nursing and intermediate nursing care in State-owned geriatric centers, institutions for the mentally retarded, institutions for the mentally ill, and in **county homes** which meet the State and Federal requirements for participation under Title XIX of the Federal Social Security Act and which are approved by the department. **This cost in county homes shall be as specified by the regulations of the department adopted under Title XIX of the Federal Social Security Act and certified to the department by the Auditor General; elsewhere the cost shall be determined by the department. . . .**

62 P.S. § 443.1 (emphasis added). Pursuant to the statutory authority contained in Section 443.1 of the Code, DPW has promulgated regulations establishing net operating cost ceilings for county nursing homes since 1978.

Despite the plain language of Section 443.1, which authorizes DPW's regulations in this area, Allegheny County maintains that the statute is vague and that DPW's regulations are invalid.[10] In making its argument, Allegheny County relies upon rules of statutory construction as found in the Statutory Construction Act of 1972, 1 Pa.C.S. §§ 1501–1991. Allegheny County claims that the legislature's intent when it amended Section 472

---

in the present appeal, 1983 through 1985, the net operating cost ceilings were amended or corrected on five different occasions. *See* 12 Pa.B. 2070 (1982) (effective July 1, 1982); 15 Pa.B. 1629 (1985) (effective retroactively to July 1, 1984); 15 Pa.B. 3181 (1985) (ceilings effective for services rendered from July 1, 1984 through December 31, 1985); 16 Pa.B. 249 (1986) (correction effective September 7, 1985); 16 Pa.B. 3294 (1986) (effective July 1, 1985). However, since Allegheny County is arguing that DPW's cost ceilings are

invalid and not that DPW has miscalculated what it must reimburse Allegheny County under those ceilings, there is no need to review the specific dollar limitations on spending which were in effect from 1983 through 1985.

10. Incredibly, in over twenty pages devoted to this issue in its brief, Allegheny County fails to address the significance of Section 443.1 and its relationship to Section 472 of the Code.

of the Code [11] in 1976 was contrary to DPW's regulations as well as the plain meaning of the statutory language.

 We disagree. Under Section 1921(b) of the Statutory Construction Act,[12] "[w]hen the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." *Id.; Borough of Glendon v. Department of Environmental Resources*, 145 Pa.Cmwlth. 238, 603 A.2d 226 (1992), *petition for allowance of appeal denied*, 530 Pa. 657, 608 A.2d 32 (1992). Section 472 and Section 443.1 of the Code expressly authorize DPW to promulgate regulations relating to net operating costs for "medical assistance." Therefore, it is unnecessary to look beyond the plain language of the statutory sections in question in order to properly interpret them. *Borough of Glendon*.[13]

Although we uphold DPW's regulations based on Sections 472 and 443.1 of the Code, which expressly authorize DPW to set costs for skilled and intermediate nursing home care, we find additional support for our decision in the fact that the legislature has failed to take any action to disturb DPW's regulations in over fifteen years. *See Hospital Association of Pennsylvania v. MacLeod*, 487 Pa. 516, 410 A.2d 731 (1980) (administrative interpretations not disturbed by the legislature are appropriate guides to legislative intent).

Finally, as recognized by this Court in *Franklin County Nursing Home v. Department of Public Welfare*, 126 Pa.Cmwlth. 375, 559 A.2d 1002 (1989), *petition for allowance of appeal denied*, 525 Pa. 649, 581 A.2d 575 (1990), Section 201 of the General Appropriations Act (GAA) of 1980 [14] directed DPW to implement new reimbursement ceilings for county nursing homes located in standard metropolitan statistical areas. Section 201 of the 1980 GAA not only provides further evidence that the Legislature had in fact intended to impose ceilings on reimbursements for operational costs of nursing homes when it enacted Sections 443.1 and 472 of the Code, but also constitutes separate statutory authority for the imposition of cost ceilings.

### III. $22,000 per Bed limit on Reimbursement for Depreciation and Interest on Capital Indebtedness

█ Allegheny County's second argument is that DPW's $22,000 per bed limitation on reimbursement for depreciation and interest is invalid and unenforceable against it. At issue are two of DPW's regulations: Section 1181.259(s) and Section 1181.260(k) of Title 55 of the Pennsylvania Code.[15] Section 1181.259(s) states:

> After July 1, 1977, allowable depreciation costs for existing, new, renovated or purchased facilities shall be limited to a maximum construction cost per bed of $22,000. The actual cost per bed will be based on the total project cost which includes the cost of land (no depreciation is recognized on land), site surveys, architectural and engineering fees, supervision, inspection and overhead, site preparation, construc-

---

**11.** Section 472 of the Code was amended by Act 132, Act of July 9, 1976, P.L. 543.

**12.** 1 Pa.C.S. § 1921.

**13.** Allegheny County argues extensively in its brief that the legislature's intent must be ascertained by considering the legislature's purpose when it enacted Act 132, prior laws, contemporaneous legislative history and other similar tools of statutory construction. However, where as here, the language of a statute is explicit, we must follow the plain language of the statute and avoid resorting to these other methods of statutory construction. 1 Pa.C.S. § 1921.

Allegheny County additionally argues that it was improperly excluded from introducing the testimony of Leroy Irvis, speaker of the Pennsylvania House of Representatives when Act 132 was enacted. However, since the language of the statute in question is unambiguous, Irvis' testimony would be irrelevant for the purposes of statutory interpretation. Moreover, even if his testimony were relevant, this Court, when ascertaining legislative intent, is not bound by the arguments of a single legislator made on the floor in debate of the issue, much less the post-Act expression of opinion by a single legislator. *Hoffman v. Pennsylvania Crime Victim's Compensation Board*, 46 Pa.Cmwlth. 54, 405 A.2d 1110 (1979). No matter how trustworthy that opinion would be, it would remain but one opinion out of two hundred and fifty-three members of the General Assembly.

**14.** Act of June 30, 1980, P.L. 1391.

**15.** 55 Pa.Code § 1181.259(s) and § 1181.260(k).

tion, fixed equipment, contingencies, interest during construction and other related costs such as attorney's fees, recording costs, transfer taxes, mortgage insurance and service charges including finder's and placement fees. If an existing facility constructs additional beds or renovates portions of the facility which include supportive services, such as dining room, physical therapy room, occupational therapy room, or maintenance area, the cost of construction of these supportive services is prorated among both existing and new beds of the facility. A separate $22,000 per bed limit applies to each construction or renovation project. The cost of movable equipment is not included in the $22,000 per bed limit.

Section 1181.260(k) states:

> Interest on capital indebtedness will be recognized on debt services incurred to finance a maximum construction cost per bed of $22,000 as defined in § 1181.259(m) and (s). If the construction cost exceeds the $22,000 per bed limit, the interest on the portion of the construction cost which exceeds the $22,000 limit is not allowable.

Allegheny County argues that the above regulations conflict with both federal and state law. Specifically, Allegheny County maintains that under Section 1122 of the SSA, 42 U.S.C. § 1320a–1 (Limitation on Federal funds for capital expenditures), DPW was obligated to reimburse it for all costs incurred for depreciation and interest. Allegheny County argues that since it obtained approval under this section for the construction of its new facilities, it is entitled to full reimbursement for these costs as a matter of law and that DPW's attempt to limit its reimbursement through regulation is invalid.

■ We cannot agree with Allegheny County's interpretation of Section 1122 of the SSA. Section 1122, which was part of the 1972 amendments to the SSA, provided for a review process of plans for capital expansion in order to place a curb on unnecessary expenditures for hospital and nursing care facilities. Although Allegheny County obtained approval for building the nursing facilities involved in this appeal under Section 1122, and such approval was required to be eligible for reimbursement, this approval did not give them an entitlement to full reimbursement for all capital costs associated with that construction. While there is no case law specifically addressing the issue of a health care provider's entitlement to reimbursement after Section 1122 approval, we have recognized that a facility is not entitled to reimbursement for capital costs just because it had previously obtained Certificate of Need (CON) [16] approval. *See Forbes Metropolitan Health System v. Department of Public Welfare,* 125 Pa.Cmwlth. 571, 558 A.2d 159 (1989) (citing *Wilmac Corp. v. Heckler,* 633 F.Supp. 1000 (E.D.Pa.1986), *vacated and remanded on other grounds,* 811 F.2d 809 (3d Cir.1987)). Similarly, we believe that approval under Section 1122 does not guarantee that a provider such as Allegheny County is entitled to be reimbursed for all costs for depreciation and interest.

■ Under the 1980 amendments to the SSA (the Boren Amendment), reimbursement for nursing homes must be:

> [R]easonable and adequate to meet costs which must be incurred by efficiently and economically operated facilities in order to provide care and services in conformity with applicable State and Federal laws, regulations and quality and safety standards. . . .

42 U.S.C. § 1396a(a)(13)(A). The term "reasonable and adequate" does not mean that nursing homes are entitled to be reimbursed for all costs, no matter how extravagant the amount. *See West Virginia University Hospitals, Inc. v. Casey,* 885 F.2d 11 (3d Cir. 1989). Furthermore, it has been held that, so long as the entire reimbursement payment falls within a range of reasonableness, a state's system of reimbursement is valid de-

---

**16.** In August of 1980, Pennsylvania ceased Section 1122 review for all new projects. The CON approval process is the successor to the system of approval found under Section 1122 and serves the similar purpose of reviewing proposed capital expenditures while containing escalating costs. Thus, we believe that cases involving reimbursement under a CON are instructive in reaching our decision in this case.

spite the fact that all reasonable costs incurred by the facility are not reimbursed. *Colorado Health Care Ass. v. Colorado Department of Social Services*, 842 F.2d 1158 (10th Cir.1988); *Folden v. Washington State Department of Social and Health Services*, 744 F.Supp. 1507 (W.D.Wa.1990), *aff'd*, 981 F.2d 1054 (9th Cir.1992).[17]

■ Allegheny County additionally argues that even if the $22,000 per bed limit was initially valid when enacted, it is arbitrary and invalid as presently applied to *it* because the limit has not been updated to reflect inflation and does not take into account differences in construction costs for large and small facilities or different geographic areas. We find this argument to be equally unpersuasive.

■ In general, a regulation promulgated by a state agency is presumed valid unless there has been a clear abuse of discretion. *Hospital Association of Pennsylvania, Inc. v. Foster*, 157 Pa.Cmwlth. 363, 629 A.2d 1055 (1993). In this case, Allegheny County has the heavy burden of proving that DPW's regulations are invalid. However, it has not presented any evidence which would substantiate its claim that DPW's regulations are unreasonable, arbitrary or capricious.

The mere fact that prices have escalated during the time period since the $22,000 limit was promulgated does not invalidate DPW's regulations. Allegheny County has not cited to any case, nor is this Court aware of any authority, which requires DPW to revise its regulations to take into account inflation, and which would, in effect, create a judicially

imposed cost of living allowance (COLA). *See Hazard v. Shalala*, 44 F.3d 399 (6th Cir.1995) (administrative agencies do not have a judicially enforceable duty to review validly enacted regulations to reflect inflation). Furthermore, while construction costs undoubtedly have increased since 1977 and Allegheny County's actual costs may have exceeded the $22,000 per bed limit, Allegheny County failed to establish that it was impossible to build a facility for that amount or that the $22,000 limit was otherwise unreasonable. Similarly, Allegheny County has not shown that the size of its facilities or its location in a metropolitan area had a significant impact on the cost of construction so as to render DPW's regulation unreasonable as applied to it.[18]

DPW is entitled to impose limits on reimbursement costs which force health care providers to adopt the most cost efficient plans possible for capital improvements. These limits are not only authorized by the SSA and Section 443.1 of the Code, but also reflect the intent of both Congress and the Pennsylvania Legislature to control the skyrocketing costs of Medicare. In the present case, Allegheny County agreed that it would use its taxing power to meet any expenditures which exceeded the $22,000 per bed regulatory limit before it gained Section 1122 approval for the construction of its planned facilities. Incredibly, based only on this Section 1122 approval, and despite DPW's regulations and Allegheny County's prior understanding that it would be liable for those costs which exceeded the $22,000 per bed

---

17. We note that even prior to the passage of the Boren Amendment in 1980, states were granted considerable latitude in determining limits on what would be considered reimbursable as a "reasonable cost." *Medicenter Hospital v. Department of Public Welfare*, 78 Pa.Cmwlth. 610, 468 A.2d 1156 (1983). Furthermore, it has been held that under pre–1980 law, states were not required to reimburse providers for all allowable costs. *See, e.g., Minnesota Association of Health Care Facilities, Inc. v. Minnesota Department of Public Welfare*, 602 F.2d 150 (8th Cir.1979). Therefore, DPW's regulations would be valid even under pre–1980 law.

18. DPW asserts that the major reason Allegheny County's construction costs exceeded the $22,-000 per bed limit was because the facilities

which were actually built were more elaborate and expensive than required in a typical nursing care facility. Allegheny County's new facilities were designed so as to allow rehabilitative services, respite care, adult day care and other non-Medicaid services. DPW contends that Allegheny County has exceeded the limit on depreciation and interest because it chose to build more elaborate facilities and not because DPW's limit is unreasonable. Although these additional facilities and programs are undoubtedly beneficial to the public, Allegheny County has failed to explain why such facilities are necessary for the operation of the Medical Assistance Program or why they should be subsidized by DPW instead of being funded through Allegheny County's own taxing power.

limit,[19] it now argues that it is entitled to be reimbursed for all costs for depreciation and interest. For the reasons enumerated above, we must reject Allegheny County's argument.

### IV. Conclusion

Having determined that DPW properly denied Allegheny County reimbursement for medical costs which were in excess of DPW's net operating cost ceilings and reimbursement for costs of depreciation and interest for capital improvements which were in excess of DPW's $22,000 per bed limit, we affirm the judgment and order of the Secretary of DPW.[20]

### ORDER

NOW, December 5, 1995, the order of the Secretary of the Department of Public Welfare in the above-captioned matter is hereby affirmed.

---

19. *See supra* note 4.

20. Allegheny County additionally argues: (a) that the attorney examiner in this case improperly excluded reports from the Independent Regulatory Review Commission which recommended that the $22,000 per bed limit be modified, and (b) that the Secretary of DPW improperly reversed findings of fact without personally hearing any evidence. However, since these issues were not raised in the statement of questions presented in Allegheny County's brief, these issues were waived and are summarily dismissed. Pa.R.A.P. 2116(a); *Pendergast v. City of Hazleton*, 102 Pa. Cmwlth. 556, 519 A.2d 540 (1986), *petition for allowance of appeal denied*, 515 Pa. 626, 531 A.2d 433 (1987).