IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Jamie E. Kelly,                          :
                    Petitioner           :
                                         :
           v.                            :
                                         :
Unemployment Compensation                :
Board of Review,                         :     No. 1525 C.D. 2019
                    Respondent           :     Submitted: January 28, 2022


BEFORE:    HONORABLE ANNE E. COVEY, Judge
           HONORABLE MICHAEL H. WOJCIK, Judge
           HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge


OPINION NOT REPORTED

MEMORANDUM OPINION BY
JUDGE COVEY                                    FILED:  May 27, 2022


           Jamie E. Kelly (Claimant) petitions this Court, pro se, for review of the

Unemployment Compensation (UC) Board of Review's (UCBR) October 16, 2019

order affirming the Referee's decision that denied Claimant UC benefits under

Sections 401(c), 4(w)(2), and 4(*l*)(2)(B) of the UC Law (Law).[1]  Essentially,

Claimant presents two issues for this Court's review: (1) whether the UCBR's

factual findings are supported by substantial evidence; and (2) whether the UCBR

properly concluded that Claimant did not submit a valid application for benefits

---

[1] Act of December 5, 1936, Second Ex. Sess., P.L. (1937) 2897, *as amended*, 43 P.S. §§
801(c) (relating to a valid application for UC benefits), 753(w)(2) (mandating working and earning
wages in "employment" in an amount equal to or in excess of six times a claimant's weekly benefit
rate in effect during such preceding benefit year), and 753(*l*)(2)(B) (Services performed for wages
are deemed employment unless and until it is shown that--(a) such individual has been and will
continue to be free from control or direction over the performance of such services; and (b) such
individual is customarily engaged in an independently established trade, occupation, profession or
business.).

when it determined that she did not earn wages in employment.[2]  After review, this Court affirms.

Claimant filed a previous application seeking UC benefits (Previous Application) as of June 3, 2018, after her separation from employment with Graham Packaging Company (Graham).  Claimant received UC benefits at a $561.00 weekly benefit rate.

Beginning in September 2018 and ending in early March 2019, Claimant engaged in a business relationship with Clearly Clean Products, LLC (Clearly Clean) as a Human Resources (HR) consultant pursuant to a verbal agreement.  Claimant provided 5 to 10 hours of services per month for Clearly Clean.  Claimant's primary project was to develop Clearly Clean's employee handbook, and she also advised Clearly Clean's HR generalist on a wide range of HR issues.  Claimant had no set hours.  Clearly Clean considered Claimant an expert in the HR field.[3]  Clearly Clean did not train Claimant, and she used her own equipment and

---

[2] In her "Statement of the Issues Presented," Claimant simply identifies the issues as Claimant's "[e]ligibility to qualify for and receive [UC benefits] as detailed by" the specific relevant sections of the Law.  Claimant Br. at 1.  In her Statement of the Case, Claimant sets forth the issues as:

1. Whether [Claimant] worked and earned wages in employment as defined[;] and

2. Were there earnings in excess of six (6) times the weekly benefit rate in effect during the preceding year[; and]

3. Whether [Claimant] accepting a part time job 5-10 hour[s] per week [sic] at Clearly Clean [Products, LLC], who [sic] misclassified her as a[n] independent contractor, made her ineligible to receive [UC benefits].

Claimant Br. at 7.  Claimant also challenges numerous factual findings throughout her brief.  Because these issues are subsumed in this Court's analysis of whether the UCBR properly concluded that Claimant did not submit a valid application for benefits, and whether the UCBR's findings are supported by substantial evidence, they will be addressed accordingly herein.

[3] Claimant has a Ph.D. in Organization and Management and is also designated as a "Senior Professional in [HR]."  Certified Record (C.R.) at 164 (Notes of Testimony, Aug. 16, 2019 at 19); *see also* C.R. at 301 (Finding of Fact (FOF) 5).  Claimant has over 29 years' experience as an "HR

supplies. Claimant worked from her home that was approximately 50 miles from Clearly Clean's facility, which she visited only once or twice. Claimant's relationship with Clearly Clean ended after Claimant completed the employee handbook project.

Claimant and Clearly Clean negotiated the terms of their relationship through email correspondence. By September 6, 2018 email, Claimant informed Clearly Clean that she "usually charge[d] by the hour rather than a retainer[] [because] [i]t's fairer to the company." Supplemental Record (S.R.) at 3.[4] In a separate September 6, 2018 email, Claimant informed Clearly Clean that "based upon the complexity of the project[,] I usually charge between $65[.00]-$85[.00] per hour. Just depends on the work and research. Very high level work may change the rate." Id. By September 18, 2018 email, Claimant informed Clearly Clean that she was generally "paid via [Internal Revenue Service (IRS) Form 1099-Misc. (1099)]" when she consulted, and "would submit a[n IRS Form W[-]9 [(W-9)] as a vendor/contractor would." Certified Record (C.R.) at 81. Claimant completed a W-9 for tax purposes. See C.R. at 74. By September 28, 2018 email, Claimant informed Clearly Clean that her "rate [was] usually between $65[.00] and $120[.00] per hour[;]" however, Claimant offered to "discount [Clearly Clean's] rate to $50[.00] per hour for consults, attachments[,] and summary notes." C.R. at 81. Claimant submitted monthly invoices to Clearly Clean entitled "Consulting Invoice[,]" identifying herself as "Consultant: Jamie E. Kelly, PhD, MS, SPHR." C.R. at 76. The enumerated services listed were "Consulting/Questions/Revisions/Email." Id. Clearly Clean paid Claimant monthly and withheld no taxes.

---

manager, consultant, independent contractor, adjunct professor and volunteer" for various entities. C.R. at 301, FOF 6; see also Claimant's resume, C.R. at 54.

[4] Because the pages are not numbered in the Supplemental Record or the Certified Record, the page numbers referenced in this Opinion reflect electronic pagination.

Claimant received a 1099 for tax year 2018 that reflected Clearly Clean paid Claimant $3,437.50. Clearly Clean also paid Claimant an additional $1,014.50 in 2019. Claimant had no wages in employment with any other entity between June 3, 2018 and June 2, 2019. Claimant completed an IRS Schedule C "Profit or Loss from Business" on her federal tax return for 2018 as an "HR Consultant" and she realized a $7,336.00 loss.[5] C.R. at 26.

On March 5, 2019, Claimant emailed Clearly Clean's staff member, Lisa Grimes (Grimes) informing her:

> I received a notice from [the Department of Labor and Industry (Department)].
>
> They [sic] requested I [c]hange my status from 1099 to W[-]2 part time so my earnings from Graham and [Clearly Clean] can be counted toward my UC claim if opened in Jun[e] 2019.
>
> I can reimburse you the taxes from 2018 and 2019 that should have been deducted. The claim will not affect Clearly Clean.
>
> Would I be able to make that change?

C.R. at 194.

> Grimes responded:
>
> I just got off the phone with [Clearly Clean's Managing Member Jeff Maguire (Maguire)] and, unfortunately, he cannot make the adjustment requested as we truly see you as a contractor because you fit the definition of one. He would have to redo our taxes to make this adjustment that he doesn't believe is an accurate one.
>
> I can't imagine [the Department] would feel otherwise. What is the reason they "feel strongly" you should be

---

[5] Therein, Claimant claimed a business expense for her car in the amount of $7,220.00, as well as $1,945.00 for travel. *See* C.R. at 26.

considered part time when we just call you occasionally when we need you for one-off things?

C.R. at 195.

Claimant replied:

I am not sure why they feel [sic] that way[.] [It is] most likely [be]cause I don't have a business and what I actually do is time sensitive[.] [A]s I said to [Maguire] will [sic] just have to figure that out [i]f and when I file [f]or [UC benefits] in June 2019[.]

*Id*. Claimant added:

I was trying to use a simple fix and I researched the ability for that correction to be made to make it simple for both of us. According to my research that correction can be made.

But I understand your position as well, so we just have to find out what they decide [sic] and then deal with that situation when that comes up.

And it will come up if I file in June 2019 for unemployment[.]

*Id*.

Claimant filed her current UC benefits application on June 2, 2019 (Application). On June 5, 2019, the Scranton UC Service Center determined (Determination) that Claimant was financially eligible for UC benefits based upon her base year earnings from Graham, but advised Claimant that "[b]etween the date of your [P]revious [A]pplication for benefits and the date of this [A]pplication, you must have worked and earned at least six time[s] the weekly benefit rate of your [P]revious [A]pplication in covered employment[,] that is employment as defined in the [] Law."[6] C.R. at 20. The Department requested pay stubs or wage verification

_____

[6] Claimant's $55,788.00 total base year wages from Graham were identified as follows: First Quarter 2018 - $32,944.00; Second Quarter 2018 - $21,181.00; Third Quarter 2018 - $1,663.00; and Fourth Quarter 2018 - $0.00.

5

for work Claimant engaged in since she filed her Previous Application. After receiving additional information from Claimant, the Department vacated the June 5, 2019 Determination and conducted a wage investigation.

> On July 22, 2019, the Department notified Claimant:
>
> To be financially eligible for UC benefits, a claimant must have sufficient base year wages, and those wages must be distributed among the four calendar quarters of the base year, as provided in Sections 404(a)-(c) of the . . . [Law]. According to Section 4(x) of the Law, compensation that constitutes "wages" is limited to compensation for services that are "employment" as defined by the Law. In other words, under the Law, not all services performed for compensation are considered "employment" and not all compensation for services performed is considered "wages."
>
> **After our investigation regarding possible wages from [Clearly Clean,] it was determined that**:
>
> . . . .
>
> You were free from direction and control over the performance of your services and were engaged in an independently established trade, occupation, profession, or business. Such services do not meet the UC definition of "employment." [Section 4(*l*)(2)(B) of the Law.]
>
> . . . .
>
> Therefore, **the compensation you received for those services was not able to be used to determine your financial eligibility**.

C.R. at 100-101.

> On July 30, 2019, Claimant appealed from the Department's decision.

A Referee conducted a hearing on August 16, 2019. Claimant, Maguire, and a Department representative testified at the hearing. Maguire testified that Claimant

> requested to sit there [sic] and assist on a project basis. She did the entire project from her house. She may have

6

come to the facility [a] maximum [of] twice. Twice. It's 100 mile[s] round-trip to our facility from her home. And, we had no control -- yes, they're a team but that's how the communication was done. She was asked to assist us and to do our employee handbook. She completed the task. She was also asked to deal with us on specific issues; small and minor issues. She was at her house. She responded when she needed to and that is the basis of the relationship.

C.R. at 178 (Notes of Testimony, Aug. 16, 2019 (N.T.) at 33). Further, according to Maguire, "[Claimant] was not on-call[,] [b]ut, . . . responded to emails from staff[] . . . [a]t her convenience. Not on our timeline. Not under our clock. At her convenience." C.R. at 179 (N.T. at 34).

Claimant testified that Clearly Clean misclassified her as an independent contractor, but she applied to Clearly Clean for a full-time HR position and her earnings were IRS Form W-2 (W-2) wages, not 1099 earnings. She admitted that her job title was "HR Consultant" and that she worked part-time, approximately 5 to 10 hours per month. C.R. at 157. Despite having requested such in her emails, Claimant declared:

> I received a 1099. I was actually totally confused about what was correct and what was not correct. When I did my taxes, I contacted the IRS. I contacted (inaudible) front office. I contacted a bunch of people, saying that you have to have the [e]mployer change this because you do not fall within those categories of an independent contractor. So, that's when the whole nightmare started.

C.R. at 157-158 (N.T. at 12-13).

The Referee sought clarification of Claimant's status:

R[eferee:] Is there a reason you would submit invoices, if you believe you were paid out an hourly wage?

C[laimant:] I just was confused about the semantics. And then, I got absolutely clearer information around the middle of February from my tax advisor that this was not correct. And, wanted to correct the situation.

7

R[eferee:] And, ma'am, with regard to being self-proclaimed as a consultant, what caused you to identify as a consultant for purposes of your invoices?

C[laimant:] I don't know. I just -- I just threw that out there; that's all. There's no reason why I did it. I never worked on a 1099 basis, ever. I've been an HR Manager for 30 years for different companies. That's why my resume is in the file. I went up to -- for a meeting at Clearly Clean, was the manager [sic] of the team. And, [Grimes] asked me, could you do this because we need to get [Clearly Clean's HR Generalist] Brittany [Steffie (Brittany)] up to speed. I said, okay.

R[eferee:] Ma'am, . . . an email dated September 18th of 2018, . . . indicates that you had requested to be paid via 1099, as you regularly did when you consulted. And, you requested to have the opportunity to submit a W-9 and be paid as a vendor; is that correct, ma'am?

C[laimant:] Yeah, it's an email but it was a mistake. It was a total misunderstanding.

R[eferee:] Well then, why would you ask to be classified as a 1099 employee?

C[laimant:] I don't know. I don't know. I just don't know. I was just confused about the W-2s, the W-9s. I'm an HR person; I'm not an accountant.

R[eferee:] Well, ma'am, you asked to be -- you requested payment by 1099 and stated that you would typically -- or, generally, -- actually, your exact words were, generally, when I consult, it is paid via 1099. Is that a true statement or is that an inaccurate statement?

C[laimant:] I have never been paid on a 1099, ever.

R[eferee:] Well, why would you make such a statement in writing to . . .

C[laimant:] I don't -- I don't know. I don' t know. I was absolutely confused.

C.R. at 160-161 (N.T. at 15-16).

On August 20, 2019, the Referee affirmed the Determination. The Referee found Claimant's testimony was "inconsistent with the competent evidence of record[,]" and did "not credit [] Claimant's inconsistent testimony." C.R. at 202. Consequently, the Referee concluded that "Claimant did not provide competent evidence to establish she had sufficient wages during the base year at issue." *Id*. Claimant appealed to the UCBR.

On October 16, 2019, the UCBR affirmed the Referee's decision. The UCBR "f[ound] credible the testimony and evidence provided by [Maguire] [but] . . . d[id] not find credible [C]laimant's testimony[,] including her testimony that she was allegedly confused about her employment relationship (W-2 v. 1099) with Clearly Clean." C.R. at 303. The UCBR concluded:

> [T]he remuneration that [C]laimant received from Clearly Clean does not constitute "wages in employment" under Section 4(*l*)(2)(B) of the Law. Because [C]laimant does not have any other wages between her benefit years, [C]laimant's [Application] is not a "valid application for benefits["] under Section 4(w)(2) of the Law.

C.R. at 304. Accordingly, the UCBR denied Claimant UC benefits under Section 401(c) of the Law.[7] Claimant appealed to this Court.[8]

Claimant first contends that numerous factual findings are unsupported by the evidence, but does not identify the specific factual findings by number in her brief.[9] Rather, Claimant asserts:

---

[7] On October 20, 2019, Claimant requested reconsideration, which the UCBR denied on November 14, 2019.

[8] "'Our scope of review is limited to determining whether constitutional rights were violated, whether an error of law was committed, or whether the findings of fact were unsupported by substantial evidence.' *Miller v. Unemployment Comp. Bd. of Rev*[.], 83 A.3d 484, 486 n.2 (Pa. Cmwlth. 2014)." *Talty v. Unemployment Comp. Bd. of Rev.*, 197 A.3d 842, 843 n.4 (Pa. Cmwlth. 2018).

[9] Nonetheless, Claimant challenged the following specific factual findings in her Petition for Review: 4, 9, 10, 17, 24, 25, 29, and 31.

9

There was no negotiation regarding hourly rate of pay. It was $50[.00] per hour. [Claimant] never requested taxes not be withheld [sic] the paycheck, i[n] fact she expected it. The statement from the [R]eferee in his decision is false. . . . [Claimant] was required to attend meetings by phone for assignments and discussions of plans forward [sic] and approvals: emails submitted as proof of requirement. That statement is false. [Claimant] was not free from direction. There were over 100 e[]mails submitted as proof there was significant direction required from management and approvals needed and stated by the management staff in their email response, in addition to phone conversations.

. . . .

[Claimant] did not work for any other company it would have conflicted in their [sic] need for [her] to be available[.] [Claimant] has the same credentials needed by any other HR manager, consultant or advisor. Claimant never worked as a paid independent consultant. [Claimant] was paid with a W-2 for any consulting work done in her career. Clearly Clean was the first company that ever paid [Claimant] with a 1099, they [sic] did that to keep their [sic] numbers down to avoid [Pennsylvania] tax and other matching withholdings. . . . The [UCBR] erred in that conclusion that the issue of a 1099 and filing a Schedule C prove an established trade or business.

Claimant Br. at 16-17.

The law is well[ ]established:

> [T]he [UCBR] is the ultimate fact-finder in [UC] matters and is empowered to resolve all conflicts in evidence, witness credibility, and weight accorded the evidence. **It is irrelevant whether the record contains evidence to support findings other than those made by the fact-finder**; **the critical inquiry is whether there is evidence to support the findings actually made**. Where substantial evidence supports the [UCBR's] findings, they are conclusive on appeal.

10

> *Ductmate Indus., Inc. v. Unemployment Comp. Bd. of Rev*[.], 949 A.2d 338, 342 (Pa. Cmwlth. 2008) (emphasis added; citations omitted).

*HPM Consulting v. Unemployment Comp. Bd. of Rev.*, 185 A.3d 1190, 1194 (Pa. Cmwlth. 2018). "Substantial evidence is relevant evidence upon which a reasonable mind could base a conclusion." *Sipps v. Unemployment Comp. Bd. of Rev.*, 181 A.3d 479, 484 (Pa. Cmwlth. 2018) (quoting *Sanders v. Unemployment Comp. Bd. of Rev.*, 739 A.2d 616, 618 (Pa. Cmwlth. 1999)).

> "In determining whether a finding of fact is supported by substantial evidence, the Court is required to give the party in whose favor the decision was rendered 'the benefit of all reasonable and logical inferences that may be drawn from the evidence of record.'" *Allegheny Cnty. Off. of Child., Youth & Fam*[*s.*] *v. Dep't of Hum. Servs.*, 202 A.3d 155, 164 (Pa. Cmwlth. 2019) (quoting *S.T. v. Dep't of Pub. Welfare, Lackawanna Cnty. Off., Child., Youth & Fam. Servs.*, 681 A.2d 853, 856 (Pa. Cmwlth. 1996)). "Mere speculation or conjecture is insufficient to support a factual finding, but where there exists the ability to draw reasonable and logical inferences from evidence that is presented, including testimony, a conclusion so derived will be sufficient, even if it may not be the only possible conclusion." *W. Penn Allegheny Health Sys. v. Workers' Comp. Appeal Bd. (Cochenour)*, 251 A.3d 467, 475 (Pa. Cmwlth. 2021).

*Hauck v. Unemployment Comp. Bd. of Rev.*, 271 A.3d 961, 970 (Pa. Cmwlth. 2022).

Given Claimant's failure to identify the specific disputed factual findings in her brief, this Court shall review the factual findings expressly raised in the Petition for Review, and those implicated in Claimant's brief, to determine if they are supported by substantial evidence.

UCBR Finding of Fact Number 9 provides: "Claimant specifically requested that she receive a [1099] for tax purposes and she completed a W-9 form for tax purposes." C.R. at 302. This finding is supported by Claimant's September 18, 2018 email to Clearly Clean and Claimant's completion of a W-9. *See* C.R. at

11

81, 74. This email contradicts Claimant's contention that she "never requested taxes not be withheld [in] the paycheck, i[n] fact she expected it." Claimant Br. at 16 (emphasis omitted). Claimant's assertion is further undermined by Claimant's failure to question Clearly Clean regarding its failure to withhold taxes in the payments she received therefrom, until she contacted it in March 2019 regarding her classification. *See* C.R. at 162-163 (N.T. at 17-18).

UCBR Finding of Fact Number 10 states: "[C]laimant generally was 'paid via 1099' when she consulted, and 'would submit a W[-]9 as a vendor/contractor would.'" C.R. at 302. UCBR Finding of Fact Number 10 is supported by Claimant's September 18, 2018 email that she generally was "paid via a 1099" when she consulted, and "would submit a W[-]9 as a vendor/contractor would." C.R. at 81. This email contradicts Claimant's contention that she "never requested taxes not be withheld [in] the paycheck, i[n] fact she expected it." Claimant Br. at 16 (emphasis omitted). Claimant's assertion is further undermined by Claimant's failure to question Clearly Clean regarding its failure to withhold taxes in the payments she received therefrom, until she contacted it in March 2019 regarding her classification. *See* C.R. at 162-163 (N.T. at 17-18).

UCBR Finding of Fact Number 12 provides: "[C]laimant informed Clearly Clean that her 'usual rate for consulting was between $65.00 and $120.00 per hour[;'] however, [C]laimant offered to 'discount [Clearly Clean's] rate to $50.00 per hour for consults, attachments and summary notes.'" C.R. at 302. This finding is supported by Claimant's September 28, 2018 email. *See* C.R. at 81.

UCBR Finding of Fact Number 13 states: "In an email dated September 6, 2018, [C]laimant also informed Clearly Clean that she 'usually charged by the hour rather than a retainer. It's fairer to the company.'" C.R. at 302. UCBR Finding of Fact Number 13 is supported by Claimant's September 6, 2018 email. *See* S.R. at 3.

12

UCBR Finding of Fact Number 14 states: "In another email dated September 6, 2018, [C]laimant informed Clearly Clean that 'based upon the complexity of the project I usually charge between $65[.00]-$85[.00] per hour. Just depends on the work and research. Very high level work may change this rate.'" C.R. at 302. UCBR Finding of Fact Number 14 is supported by Claimant's September 6, 2018 email. *See* S.R. at 3.

UCBR Finding of Fact Number 16, that states: "[C]laimant had no set hours[,]" is supported by Maguire's testimony. *See* C.R. at 166 (N.T. at 21).

UCBR Finding of Fact Number 17 states: "[C]laimant's primary project was to develop an employee handbook for Clearly Clean." C.R. at 302. This finding is supported by Maguire's testimony that "[Claimant's] primary function was a project-based function. We are a new company; growing. We needed an employee handbook. And, what we primarily requested her to do was to help develop that handbook with her expertise in human resources, that is obvious from all her emails and all her invoices." C.R. at 165 (N.T. at 20).

UCBR Finding of Fact Number 24 states that "[C]laimant did not receive any training, had her own equipment and supplies and did not have to attend any meetings." C.R. at 303. This finding is supported by the Employer Questionnaire, *see* C.R. at 96, and IRS Form SS-8 (Determination of Worker Status for Purposes of Federal Employment Taxes and Income Tax Withholding), *see* C.R. at 50-51, both of which Maguire completed, and state that Clearly Clean provided Claimant no training. Claimant's testimony that she provided her own computer, phone, and email and that Clearly Clean did not provide any tools, *see* C.R. at 163-164 (N.T. at 18-19), further supports UCBR Finding of Fact Number 24. With respect to Claimant's required attendance at meetings, several emails support Claimant's assertion that she participated in numerous phone conferences. However, the UCBR correctly notes in its brief that

13

[w]hile the emails do show that telephone calls between Claimant and Clearly Clean's staff members were often scheduled [with Claimant's consent], a cursory review of the emails demonstrates that Claimant was treated as the clear authority, and that Clearly Clean staff members were nothing but deferential, [and] eagerly solicitous of her guidance and opinion.[10]

UCBR Br. at 20-21.

UCBR Finding of Fact Number 25, stating that "[C]laimant was not supervised by anyone from Clearly Clean[,]" C.R. at 303, is supported by the Employment Status Questionnaire Maguire completed, *see* C.R. at 64-64, and Maguire's testimony. *See* C.R. at 178 (N.T. at 33). Further, according to Maguire, "[Claimant] was not on-call[,] [b]ut, . . . responded to emails from staff[] . . . [a]t her convenience. Not on our timeline. Not under our clock. At her convenience." C.R. at 179 (N.T. at 34). As accurately characterized by the UCBR, the emails clearly demonstrated that "Claimant was in charge of the drafting project and that Clearly Clean's staff members only acted in supportive roles, proof[]reading Claimant's drafts and offering minor suggested amendments." UCBR Br. at 22.

UCBR Finding of Fact Number 26, which states: "[C]laimant was free to work for anyone who wished to avail themselves of her HR consulting services[,]" is supported by Claimant's completed Employment Status Questionnaire, wherein Claimant responded "no" to the question: "[d]oes the business restrict you from performing similar services for others."[11] C.R. at 47. UCBR Finding of Fact Number 26 is also supported by Employer's Employment Status Questionnaire Maguire completed, wherein Maguire also answered "no" to the same question, C.R.

---

[10] *See, e.g.*, S.R. at 20 (In an October 10, 2018 email to Claimant, Claimant's purported supervisor Grimes thanked Claimant for her work on the employee manual and **asked Claimant for permission** to proofread her work: "May I ask - can I review just for grammar/punc[tuation] prior to publication – not that I noticed a ton or anything but always good to have a second set of eyes reading for that – especially since this sucker is gonna live [] on for 10 years[.]").

[11] Claimant wrote next to the question: "N/A - only worked for them[.]" C.R. at 47.

at 65, by Claimant's testimony that she only worked five to ten hours per month for Clearly Clean, *see* C.R. at 161 (N.T. at 16), and by Maguire's testimony that Claimant responded to Clearly Clean's emails "at her convenience." C.R. at 179.

UCBR Finding of Fact Number 29, which provides that "[C]laimant had no wages in employment with any other entity between June 3, 2018, and June 2, 2019[,]" C.R. at 303, is supported by Claimant's own testimony. *See* C.R. at 160 (N.T. at 15). Finally, UCBR Finding of Fact Number 31, which states that "[t]he relationship ended after [C]laimant completed the task of creating an employee handbook[,]" C.R. at 303, is supported by Maguire's testimony that the completion of the employee handbook was the reason that Clearly Clean's relationship with Claimant ended. *See* C.R. at 167 (N.T. at 22).

Accordingly, giving Employer "the benefit of all reasonable and logical inferences that may be drawn from the evidence of record," as we must, this Court holds that substantial evidence supports the UCBR's challenged Findings of Fact Numbers 9-10, 12-14, 16-17, 24-26 and 29. *Hauck*, 271 A.3d at 970 (quoting *Allegheny Cnty.*, 202 A.3d at 164).

Claimant next contends that the UCBR erroneously concluded that she did not submit a valid application. Section 401(c) of the Law states that compensation shall be payable to any employe who is or becomes unemployed, and who "[h]as made a **valid application** for benefits with respect to the benefit year for which compensation is claimed . . . ." 43 P.S. § 801(c) (emphasis added). Section 4(w)(2) of the Law provides:

> An application for benefits filed after the termination of a preceding benefit year by an individual shall not be considered a **Valid Application for Benefits** within the meaning of this subsection, **unless such individual has**, subsequent to the beginning of such preceding benefit year and prior to the filing of such application, **worked and earned wages in "employment" as defined in th**[e]

15

> **[Law] in an amount equal to or in excess of six (6) times his weekly benefit rate in effect during such preceding benefit year**.

43 P.S. § 753(w)(2) (emphasis added).

> Further, Section 4(*l*)(2)(B) of the Law states, in pertinent part:

> Services performed by an individual for wages shall be deemed to be **employment** subject to th[e] [Law], **unless** and until it is shown to the satisfaction of the [D]epartment that -- (a) such individual has been and will continue to be **free from control or direction** over the performance of such services both under his contract of service and in fact; and (b) as to such services **such individual is customarily engaged in an independently established trade**, **occupation**, **profession or business**.

43 P.S. § 753(*l*)(2)(B) (emphasis added). "Whether an individual is an employee or [an] independent contractor under Section 4(*l*)(2)(B) of the Law is a question of law[] subject to this Court's review." *Weaver Hauling & Excavating, LLC v. Dep't of Lab. & Indus., Off. of Unemployment Comp. Tax Servs.*, 132 A.3d 557, 572 n.7 (Pa. Cmwlth. 2016).

The UCBR acknowledges that Claimant received remuneration from Clearly Clean in an amount greater than six times her weekly benefit rate in the preceding year.[12] Therefore, the issue before this Court is whether Claimant was an employee or independent contractor under Section 4(*l*)(2)(B) of the Law, and thus, the remuneration Clearly Clean paid constituted "wages in 'employment'" as required by Section 4(w)(2) of the Law. 43 P.S. § 753(w)(2).

> The Pennsylvania Supreme Court has declared:

> Section [4](*l*)(2)(B) [of the Law] contains a presumption of employment: "Services performed by an individual for wages shall be deemed to be employment subject to this

___

[12] *See* UCBR Br. at 16. Six times Claimant's Previous Application weekly $561.00 benefit rate is $3,366.00. The record evidence reflects that Clearly Clean paid Claimant $3,437.50 in 2018 and an additional $1,014.50 in 2019. Accordingly, Claimant's remuneration exceeded $3,366.00.

16

[A]ct." 43 P.S. § 753(*l*)(2)(B). This presumption of employment remains "until it is shown to the satisfaction of the [D]epartment" that the individual in question <u>is not subject to control and is customarily engaged in an independently established trade, occupation, profession or business</u>. *Id*. The employment presumption ensures provision of the broadest possible benefits to those who experience forced unemployment. Indeed, providing benefits to a worker until an employer or the Department demonstrates that he is ineligible for such benefits promotes the General Assembly's policy to help workers who are separated from employment through no fault of their own.

The two factors in Section [4](*l*)(2)(B) [of the Law] are in the conjunctive, and thus the party challenging a claimant's employment status must establish **both** parts of the test to demonstrate that a claimant's services are self-employment.

*Lowman v. Unemployment Comp. Bd. of Rev.*, 235 A.3d 278, 300 (Pa. 2020) (underline emphasis added; citations omitted).[13]

### Control Factor - Section 4(*l*)(2)(B)(a) of the Law

In order to satisfy "the control factor, the evidence must show that the claimant is 'not subject to control or direction.' 43 P.S. § 753(*l*)(2)(B)(a)." *Lowman*, 235 A.3d at 300. The *Lowman* Court expounded:

In assessing the control factor, the Commonwealth Court has identified additional indicia of control. *See, e.g.*, *Stauffer* [*v. Unemployment Comp. Bd. of Rev.*], 74 A.3d [398,] 404-05 [(Pa. Cmwlth. 2013)] (examining whether employer paid claimant [a] fixed rate of pay; withheld taxes from claimant's pay; supplied tools or equipment necessary to perform work; set time and location for work or meetings; and had the right to monitor the claimant's work and review performance); *Glatfelter Barber Shop v. U[nemployment] C[omp.] B[d. of] R[ev.]*, 957 A.2d 786,

---

[13] This Court recognizes that *Lowman* was not decided until after the UCBR issued its decision herein.

17

790 (Pa. C[mwlth]. 2008) (examining who set hours of operation, how and when claimant was paid, who set price for services, who provided equipment and supplies, whether claimant was required to attend meetings and give notice of vacation, [and] whether claimant executed non-compete clause and was subject to supervision of work). No one factor resolves the control factor, and the determination must be made based on the unique circumstances of each case.

*Lowman*, 235 A.3d at 300-01.

Moreover,

[p]ursuant to Section [4](*l*)(2)(B) [of the Law], the freedom from control or direction must be both "under his contract of service and in fact . . . ." "Control . . . is not a matter of approving or directing the final work product so much as it is a matter of controlling the means of its accomplishment." *CE Credits OnLine v. Unemployment Comp. Bd. of Rev*[.], 946 A.2d 1162, 1169 (Pa. C[mwlth]. 2008).

*Lowman*, 235 A.3d at 303.

Here, the UCBR reasoned:

[C]laimant negotiated the fixed rate of $50.00 per hour; taxes were not withheld from [C]laimant's pay at her own request; [C]laimant worked from home and provided her own supplies and the tools necessary to carry out her consulting services; Clearly Clean did not provides [sic] on-the-job training; and [C]laimant was not required to attend regular meetings. Therefore, the [UCBR] concludes that [C]laimant was free from direction and control of Clearly Clean in the performance of her services as an HR consultant.

C.R. at 304.

The record evidence reflects that Claimant negotiated her remuneration in her initial emails to Clearly Clean. *See* S.R. at 3, C.R. at 81. She worked from home and provided her own supplies. *See* C.R. at 163-164 (N.T. 18-19). Claimant went to Clearly Clean's offices, at most, twice. *See* C.R. at 178 (N.T. at 33).

18

Although Claimant received information about Clearly Clean, Clearly Clean did not train her to perform her duties. Instead, Claimant was treated as an individual with knowledge and authority, and her purported supervisor exhibited deference to Claimant and reliance upon Claimant's expertise.[14] Further, although Claimant participated in Clearly Clean conference calls, Clearly Clean requested her participation, and such conference calls were generally scheduled at Claimant's convenience. *See, e.g.*, S.R. at 4-6. Based on the record evidence, this Court discerns no error in the UCBR's conclusion that Clearly Clean did not direct or control Claimant's work performance.

### Independence Factor - Section 4(*l*)(2)(B)(b) of the Law

Regarding the independence factor, the Pennsylvania Supreme Court examined Section 4(*l*)(2)(B)(b) of the Law in *A Special Touch v. Department of Labor & Industry, Office of Unemployment Compensation Tax Services*, 228 A.3d 489 (Pa. 2020), and *Lowman*.[15]

The *Special Touch* Court interpreted Section 4(*l*)(2)(B)(b) of the Law as follows:

> [W]e read [Section 4](l)(2)(B)[(b)of the Law] *to be unambiguous in requiring a putative employer to show that an individual **is actually** involved in an independent trade, occupation, profession, or business in order to establish that the individual is self-employed* under the second prong of [Section 4](l)(2)(B)[(b)of the Law]. We read nothing in the definitions of either "customarily" or "engaged," or in [Section 4](l)(2)(B)[(b)of the Law]

---

[14] *See, e.g.*, S.R. at 20 (October 10, 2018 email to Claimant). *See also* S.R. at 6 (September 25, 2018 email, wherein Claimant notified Brittany: "Kindly call me about 9:30 a[.]m[.] and let's discuss before any action is taken. This is critical. It can be a conference call i[f] you want your team to sit in.").

[15] The UCBR issued its October 16, 2019 decision herein before the Pennsylvania Supreme Court filed its 2020 decision in *Special Touch*.

beyond this crucial phrase, to signal that the phrase requires only that an individual be capable of being involved in an independently established trade, occupation, profession, or business. Indeed, we view [Section 4](*l*)(2)(B)[(b) of the Law]'s use of the word "is" before the phrase "customarily engaged" to lend further credence to our interpretation. *See* 43 P.S. § 753(*l*)(2)(B)[(b)] (requiring a putative employer to establish that an individual "is customarily engaged in an independently established trade, occupation, profession or business" as to the services provided to the putative employer by the individual).

*Special Touch*, 228 A.3d at 503-04 (italic and bold emphasis added).

The *Special Touch* Court added:

Having determined that the phrase "customarily engaged" requires actual, rather than hypothetical, involvement in an independent trade or business, **we are careful to emphasize that our interpretation does not equate "actual involvement" to a requirement that an individual "actually perform his or her services" for third parties during a given time period**. In other words, **we agree with the notion that an individual can be an independent contractor who "is simply satisfied working for a single client or at a single location" depending on the circumstances**. *Special Touch*, 192 A.3d [1238,] 1243 [(Pa. Cmwlth. 2018)]. Similarly, and like the Commonwealth Court below, **we disagree that "one who works only on occasion is necessarily an employee."** *Id*.

Thus, the analysis under this requirement does not simply turn on the extent to which an individual actually provides his or her services to either the putative employer or third parties, although these considerations are certainly relevant. Rather, the "customarily engaged" language can encompass more activity than actually providing services for others, so long as it is demonstrated that the individual is in some way actually involved in an independently established trade or business. In this respect, **we agree with the Department that circumstances demonstrating that an individual is actively holding [herself] out to perform services for another**, such as

20

through the use of business cards or other forms of advertising, **even if not actually performing those services during a particular time period at issue**, **are also relevant to the analysis**.

*Special Touch*, 228 A.3d at 504 (emphasis added).

Shortly after issuing its *Special Touch* decision, the Pennsylvania Supreme Court emphasized in *Lowman*:

While the independence factor may be established through evidence that the claimant has acquired the traditional trappings of a business, *e.g.*, a license, a lease, an ownership interest in the assets of a trade or business, business cards, clients, advertising, and/or evidence related to the other factors considered by this Court in *Danielle Viktor*[*, Ltd. v. Department of Labor & Industry, Bureau of Employer Tax Operations*, 892 A.2d 781 (Pa. 2006)],[16] we reiterate that, like the control factor, **no one**

---

[16] In *Danielle Viktor*, the issue before the Court was "whether individuals who drive limousines (Drivers) for six limousine companies (Appellees) [were] independent contractors or employees pursuant to Section [4](*l*)(2)(B)(b) of the [Law.]" *Danielle Viktor*, 892 A.2d at 783. The Pennsylvania Supreme Court concluded:

> The record supports that . . . Drivers met [Section 4(*l*)(2)(B)(b) of the Law], for several reasons, including: (1) the Drivers' ability to perform their services for more than one entity, including competitors, with no adverse consequences; (2) the operation of their businesses and their ability to perform work did not depend on the existence of any one of the Appellees; and (3) the fact that Drivers bring all necessary perquisites [sic] of providing driving services to limousine companies, even though they do not own the limousines or bear all of the financial risk.

> Drivers possess the requisite interest and tools of their trade necessary for the conduct of the business of providing driving services to limousine companies, including their licenses to drive, training, experience, and ability. The fact that Appellees, rather than Drivers, own the limousines because of the realities involved in satisfying [Pennsylvania Public Utility Commission] requirements does not diminish the fact that Drivers are engaged in their independently established businesses.

*Danielle Viktor*, 892 A.2d at 801-02.

21

> **circumstance is dispositive, and each case must be addressed on its unique facts**.

*Lowman*, 235 A.3d at 302-03 (emphasis added).

In the instant matter, the UCBR concluded relative to the independence factor:

> [C]laimant was free to perform her services as an HR consultant to anyone who wished to avail themselves of the services; also, the nature of the business did not compel [C]laimant to look only to Clearly Clean for the continuation of her consulting services. Significantly, [C]laimant is highly credentialed and has extensive experience in the field of [HR], which includes experience as an independent consultant. Finally, [C]laimant completed a Schedule C for her consulting business for 2018. Therefore, the [UCBR] concludes that [C]laimant was customarily engaged in an independently established trade business or profession as an HR consultant.

C.R. at 304.

> *Lowman* directs:
>
> In the context of determining whether an individual is engaged in self-employment and therefore, ineligible for benefits, an analysis using Section [4](*l*)(2)(B) [of the Law] does not evaluate what a claimant could do, but what [s]he has done and/or is doing in terms of providing personal services for remuneration. Looking at a claimant's real-time activities through the lens of Section [4](*l*)(2)(B) [of the Law] avoids speculation based on hypothetical considerations and aids in evaluating a claimant's actual status for eligibility purposes.

*Lowman*, 235 A.3d at 303.

As discussed above, the UCBR found that Claimant represented herself to Clearly Clean as an HR Consultant who was generally paid via 1099 and would submit a W-9 as a vendor/contractor would. Indeed, she completed a W-9 for Clearly Clean. Further, Claimant set her own remuneration rate and notified Clearly

22

Clean that her rate might change depending on the complexity of the work. Clearly Clean withheld no taxes. Claimant submitted monthly invoices to Clearly Clean entitled "Consulting Invoice[,]" identifying herself as "Consultant: Jamie E. Kelly, PhD, MS, SPHR." C.R. at 302, Finding of Fact (FOF) 14. Further, she worked only 5 to 10 hours per month, she had no set hours at Clearly Clean, and Clearly Clean did not prohibit her from working for others; thus, she could offer her HR consulting services to others. Claimant completed an IRS Schedule C, titled, "Profit or Loss From Business (Sole Proprietorship)" for her consulting at Clearly Clean, wherein she identified her "[p]rincipal business or profession" as "HR Consultant" and her "[b]usiness name" as "Jamie E. Kelly[.]" C.R. at 303, FOF 30.

Further, Claimant had previously worked on contract. Claimant's resume reflects that she worked as a "Human Resources Consultant" from August 2013 to May 2014, and worked on a "Human Resources Manager Contract" from May 2014 to May 2015 and on a "Human Resources Contract" from May 2016 to January 2017. C.R. at 54 (emphasis omitted); *see also* C.R. at 301, FOF 6. She also listed herself, among other things, as an independent contractor at the top of her resume.

The UCBR's factual findings support the conclusion that Claimant "is **actually** involved in an **independent trade**, **occupation**, **profession**, **or business**" and that Claimant's services for Clearly Clean are related thereto. *Special Touch*, 228 A.3d at 503-04 (emphasis added). Indeed, the only record evidence that Claimant was not actually engaged in an independent trade, occupation, profession, or business, was Claimant's testimony which the UCBR found not credible,[17] and

---

[17] Specifically, the UCBR opined: "[T]he [UCBR] finds credible the testimony and evidence provided by the witness from Clearly Clean. The [UCBR] does not find credible [] [C]laimant's testimony including her testimony that she was allegedly confused about her employment relationship (W-2 v. 1099) with Clearly Clean." C.R. at 303. "Questions of credibility and the resolution of evidentiary conflicts are within the discretion of the UCBR and

her emails to Clearly Clean requesting a change from 1099 to W-2 so she could receive UC benefits. Accordingly, Claimant's work for Clearly Clean was not employment under Section 4(*l*)(2)(B) of the Law, and her remuneration from Clearly Clean did not constitute "wages in 'employment'" under Section 4(w)(2) of the Law. 43 P.S. § 753(w)(2).

      For all of the above reasons, the UCBR's order is affirmed.


_____
ANNE E. COVEY, Judge

are not subject to re-evaluation on judicial review." *Bell v. Unemployment Comp. Bd. of Rev.*, 921 A.2d 23, 26 n.4 (Pa. Cmwlth. 2007).

Jamie E. Kelly,                    :
         Petitioner       :
                            :
       v.                   :
                            :
Unemployment Compensation  :
Board of Review,          :   No. 1525 C.D. 2019
         Respondent   :

# O R D E R

AND NOW, this 27th day of May, 2022, the Unemployment Compensation Board of Review's October 16, 2019 order is affirmed.

_____
ANNE E. COVEY, Judge